**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| NAKILA V. VINEY, as ADMINISTRATOR of the ESTATE OF ERIC VINEY,<br><br>　　　　　　　　　**Plaintiff,**<br><br>　　**v.**<br><br>MONTGOMERY COUNTY; PRIMECARE MEDICAL, INC.; MARGARET CARRILLO, MD; JONATHAN COHEN, MD; MEGHAN HUGHES, PA; and KATIE HARVEY, CRNP,<br><br>　　　　　　　　　**Defendants.** | :<br>:<br>: 　**CIVIL ACTION**<br>:<br>: 　**No. 20-_____**<br>:<br>: 　**JURY TRIAL DEMANDED**<br>:<br>:<br>:<br>:<br>:<br>:<br>: |

## COMPLAINT

### I. PRELIMINARY STATEMENT

1.      This is a civil rights survival and wrongful death action brought under 42 U.S.C. § 1983 concerning the defendants' deliberate indifference to the serious medical needs of decedent Eric Viney while he was detained at the Montgomery County Correctional Facility ("MCCF").

2.      Within days of Mr. Viney's July 21, 2018 admission to MCCF, the defendant medical professionals were aware that Mr. Viney was suffering from a serious illness.  They knew that he experienced significant and unexplained fluctuations in weight, substantial swelling in his extremities, and signs of jaundice, with his eyes turning yellow.

3.      The defendants ordered lab testing to assess Mr. Viney's condition.  But the testing was never conducted.  They directed that Mr. Viney be assigned to a specialized medical housing unit so his condition could be observed.  But they never assessed him.  They simply ignored his worsening symptoms.

4.      By the evening of August 7, 2018, Mr. Viney's health had deteriorated dramatically.  He had severely increased respirations and significant swelling throughout his body.  He could not eat, and he was not urinating.  He was unable to walk.

5.      Mr. Viney was sent to a local emergency room.  By time he arrived, he was in critical condition with complete organ failure.  Mr. Viney spent the next 100 days in an intensive care unit cycling in and out of a comatose state.  Ultimately, his multi organ failure had progressed too far to be susceptible to treatment, and he died on November 17, 2018.  He was 36 years old.

6.      Based on medical diagnoses made upon Mr. Viney's hospitalization, it was clear that his condition resulted from a disorder called chronic dilated cardiomyopathy—a serious, but treatable, cardiac illness.  However, because the defendants, with deliberate indifference, failed to respond to his obvious and worsening symptoms, he progressed to the point of irreversible organ failure.

7.      The defendants' failure to respond to Mr. Viney's condition with continuous monitoring and referral for hospitalization was consistent with an established pattern in the medical department at MCCF.  Based on allegations made in multiple federal civil rights actions filed in this Court and elsewhere, defendant Montgomery County and its contract medical provider, defendant PrimeCare Medical, Inc., were aware of recurring problems with MCCF medical practitioners' response to serious medical conditions like Mr. Viney's.  But, for years, they, with deliberate indifference, failed to take action to remedy those problems.

8.      In light of the defendants' actions and inactions resulting in Mr. Viney's death, Plaintiff Nakila V. Viney, Mr. Viney's wife and the administrator of his estate, now seeks on

behalf of the estate and Mr. Viney's heirs damages for the substantial pain and suffering, the loss

of life, and the financial losses caused by the defendants' conduct.

## II. JURISDICTION

9.      This Court has jurisdiction over the subject matter of this Complaint under 42

U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343(a)(3), 1343(a)(4), and 1367(a).

## III. PARTIES

10.     Decedent Eric Viney was at all times relevant to this Complaint a resident of

Norristown, Pennsylvania.  He died at the age of 36 on November 17, 2018.

11.     Plaintiff Nakila V. Viney ("plaintiff" or "Ms. Viney"), the wife of decedent Eric

Viney, was on August 14, 2019, appointed as the Administrator of the Estate of Eric Viney.

Plaintiff brings this action in her capacity as Administrator of the Estate and for the benefit of

Mr. Viney's heirs.

12.     Defendant Montgomery County is a municipal government entity in the

Commonwealth of Pennsylvania, which manages and oversees the Montgomery County

Correctional Facility ("MCCF"), 60 Eagleville Road, Eagleville, PA 19403.

13.     Defendant PrimeCare Medical, Inc. ("PrimeCare"), which has a principal place of

business at 3940 Locust Lane, Harrisburg, PA 17109, was, at all times relevant to this

Complaint, the holder of a contract to provide all medical services to inmates at MCCF.

14.     At all times relevant to this Complaint, defendant Margaret Carrillo, MD, was a

physician employed by defendant PrimeCare and assigned to work as the medical director at

MCCF.

15.     At all times relevant to this Complaint, defendant Jonathan Cohen, MD, was a

physician employed by defendant PrimeCare and assigned to work at MCCF.

16.     At all times relevant to this Complaint, defendant Meghan Hughes, PA, was a physician assistant employed by defendant PrimeCare and assigned to work at MCCF.

17.     At all times relevant to this Complaint, defendant Katie Harvey, CRNP, was a certified registered nurse practitioner employed by defendant PrimeCare and assigned to work at MCCF.

18.     At all times relevant to this Complaint, all defendants acted under color of state law.

19.     At all times relevant to this Complaint, all defendants acted in concert and conspiracy and were jointly and severally responsible for the harms caused to the Estate of Eric Viney and Mr. Viney's heirs.

20.     At al times relevant to the Complaint defendants Carrillo, Cohen, Hughes, and Harvey were acting as agents, servants, and/or employees of defendant PrimeCare, and were acting within the scope and course of their employment, and under the direct control and supervision of defendant PrimeCare.

## IV.  FACTUAL ALLEGATIONS

### A.  Pattern of Avoidable Deaths and Injuries
### Caused by Inadequate Medical Care at MCCF

21.     In or around 2012, defendant PrimeCare entered into a contract with defendant Montgomery County that granted PrimeCare the exclusive right to provide medical services to prisoners at MCCF.

22.     Upon information and belief, the contract provided that Montgomery County would pay to PrimeCare an annual fee for its provision of medical services and that PrimeCare would be responsible for all costs, up to a limit for catastrophic cases, for prisoners who required outside medical services, including hospitalization for serious illnesses.

23.     Under such contractual arrangements, an expenditure of funds for a prisoner's hospitalization reduces PrimeCare's annual profits.

24.     When PrimeCare secured the contract for medical services at MCCF, it retained as its own employees several medical professionals who had worked at MCCF as employees for previous medical contractors.

25.     In particular, PrimeCare hired as its medical director defendant Dr. Margaret Carrillo.

26.     Dr. Carrillo had been the medical director at MCCF for several years prior to her hiring by PrimeCare and remained the medical director through the time of the events at issue in this Complaint.

27.     Throughout her time as medical director, Dr. Carrillo has been the chief medical professional charged with the care of prisoners at MCCF and the supervision of all other medical professionals at MCCF.

28.     During Dr. Carrillo's time as medical director at MCCF, medical professionals at MCCF have been sued in multiple federal civil rights lawsuits based on allegations that they, among other things, failed to properly monitor prisoners presenting with signs of serious medical conditions and failed to seek hospital treatment for prisoners whose conditions could not be safely treated at MCCF.

29.     Those cases include the following litigated in the Eastern District of Pennsylvania:

        a.     *D'Agostino v. Montgomery County et al.*, No. 2:11-cv-07728-CMR, in which the plaintiff alleged that Dr. Carrillo, among others, was aware that he was confined to a wheelchair unable to move his legs but failed to monitor him for

more than 48 hours leading to permanent physical injury due to an untreated
spinal abscess;

b. *Hasty v. Montgomery County et al.*, No. 2:12-cv-04335-RBS, in which the
plaintiff alleged that medical providers failed to respond to the plaintiff's
priapism (a painful and continuous erection) leading to the plaintiff's
permanent impotence;

c. *Gentile v. Smith et al.,* No 2:12-cv-07013-TJS, in which plaintiff alleged that
he was beaten by correctional officers and, following this assault, Dr. Carrillo
and others left him handcuffed in four point restraints for three days without
food or ability to use the bathroom, while continuously over-sedating him
with Ativan resulting in plaintiff's hospitalization and suffering permanent
scarring and pain;

d. *Kenney v. Montgomery County et al.*, No. 2:13-cv-02590-EGS, in which the
plaintiff alleged that Dr. Carrillo, among others, failed to properly monitor the
25-year-old-decedent who presented with obvious signs of a common and
treatable cardiac condition, leading to organ failure and death;

e. *Valladares v. Pike County et al.,* No. 2:14-cv-02674-AB, in which the plaintiff
alleged that Dr. Carrillo, among others, failed to respond to a clearly displaced
fracture in his finger, leading to permanent loss of full usage of the plaintiff's
finger and hand;

f. *Minnich v. Montgomery County et al.,* No. 2:14-cv-07236-MH, in which the
plaintiff alleged that medical providers ignored clearly expressed suicidal

ideation and failed to put the decedent on suicide watch, leading to the decedent's suicide by hanging;

g. *Gibbons v. Montgomery County et al.,* No. 2:16-cv-01233-MH, in which the plaintiff alleged that after tearing his Achilles tendon, he was denied medical care by Dr. Carrillo and others for weeks leading to a more complicated surgery than would have otherwise been necessary and, in turn, leading to permanent pain and limitations;

h. *Devine v. Montgomery County et al.*, No. 2:18-cv-04652-GEKP, in which the plaintiff, as in *Hasty*, alleged that medical providers failed to respond to the plaintiff's priapism leading to his permanent impotence;

i. *Lynch v. PrimeCare Medical, Inc., et al.,* No. 2:19-cv-04511-JPH, in which the plaintiff alleged that, in 2017, medical providers, including Dr. Carrillo, refused to continue his necessary Klonopin prescription, resulting in severe withdrawal symptoms including nightmares, inability to work, pain, seizures, loss of consciousness, and panic attacks; and

j. *Rogers v. Montgomery County, et al,* No. 2:19-cv-04921-JDW, in which the plaintiff alleged that, in 2017, medical providers, including Dr. Carrillo, failed to respond to the decedent's clear symptoms of medical distress including vomiting and inability to breathe or support himself, leading to the decedent's cardiac arrest and death.

30.     Prior to the events at issue in this case, defendant PrimeCare was aware of the inadequate care provided by medical professionals at MCCF as described in the above cases and failed to remedy the deficiencies in employee performance that led to such inadequate care.

31.     To the extent the events at issue in the above cases occurred before PrimeCare held the contract for medical services at MCCF, PrimeCare was aware that those events occurred under the supervision of some of the same employees which PrimeCare chose to retain upon securing the contract.

32.     Further, PrimeCare failed to remedy any deficiencies in employee performance which predated PrimeCare's service as the MCCF contract medical provider.

33.     Prior to the events at issue in this case, defendant Montgomery County was aware of the inadequate care provided by medical professionals employed by its medical care contractors as outlined in the above cases and has failed to remedy the deficiencies in performance that caused harm to the prisoners in its custody.

**B.  Mr. Viney's Serious Medical Needs and Defendants' Inadequate Care**

34.     Mr. Viney was admitted to MCCF on July 21, 2018, after he was arrested on drug charges.

35.     On the afternoon of July 21, 2018, Mr. Viney met with a PrimeCare medical assistant for an initial medical screening.  The medical assistant reported that Mr. Viney stated he had been diagnosed with hypothyroidism and that, although he had been prescribed medications in the past for that condition, he had not taken medications for several months.

36.     Records from Mr. Viney's prior incarceration at MCCF in 2013, which were available in an electronic medical chart, confirmed this diagnosis and that medications had been prescribed for Mr. Viney.

37.     In the July 21, 2018 initial medical screening, the PrimeCare medical assistant reported that Mr. Viney's weight was 186 pounds.  In his prior incarceration, Mr. Viney's weight was 148 pounds.

38.     Mr. Viney's 38-pound increase in weight was a sign consistent with untreated hypothyroidism.

39.     The medical assistant who conducted the initial medical screen scheduled a "chronic care" and "physical examination" appointment for Mr. Viney to take place on July 25, 2018.

40.     Before the scheduled chronic care and physical examination appointment, on July 24, 2018, Mr. Viney was seen again by a PrimeCare medical professional.  He complained that he was experiencing chest congestion, fever, sinus congestion, a runny nose, sore throat, and a productive cough.  Mr. Viney was given over-the-counter cold medications.

41.     On that same date, Mr. Viney's weight was measured at 192 pounds—a six-pound increase in just three days.

42.     The scheduled chronic care and physical examination appointment did not take place on July 25, 2018.

43.     Mr. Viney was not seen for the chronic care and physical examination appointment until five days later.

44.     On July 30, 2018, Mr. Viney was seen by defendant Katie Harvey, CRNP.  She noted in the medical record that Mr. Viney had hypothyroidism and had not taken medications for approximately nine months.

45.     Harvey recorded, further, that Mr. Viney reported he was suffering from constipation and that he stated "I cannot remember the last time I went."

46.     According to Harvey, Mr. Viney complained of other symptoms suggestive of illness, including that he was coughing, feeling very cold, and eating and drinking less than usual.

47.     Harvey recorded Mr. Viney's weight and found that he was 200 pounds.  Harvey, therefore, knew that Mr. Viney had gained eight pounds in six days and a total of 14 pounds in the nine days of his incarceration.

48.     This extreme and unexplained weight gain, in combination with Mr. Viney's other symptoms, was a significant concern and a worrying sign that Mr. Viney was suffering from a serious illness.

49.     Harvey discussed Mr. Viney's symptoms with defendant Dr. Jonathan Cohen.

50.     Harvey and Cohen decided that they would order laboratory testing to assess Mr. Viney's thyroid-simulating hormone (TSH) levels.  An order was issued for the laboratory studies to be drawn the next day, July 31, 2018.

51.     Harvey and Cohen took no other action to assess Mr. Viney's unexplained and significant weight gain.

52.     The laboratory studies ordered by Harvey and Cohen did not take place on July 31, 2018.

53.     Harvey and Cohen, who knew of Mr. Viney's worrying condition and the need for laboratory assessment, took no action to ensure that the assessment would take place.

54.     Three days later, on August 3, 2018, the laboratory studies had still not been drawn.

55.     On that date, Mr. Viney was seen by a nurse who noted that both of Mr. Viney's ankles were now swollen.

56.     This new and unexplained symptom, in combination with Mr. Viney's recent symptoms, was yet another concerning sign that Mr. Viney was suffering from a serious illness.

57.     The next day, on August 4, 2018, the finding concerning swelling in Mr. Viney's ankles was reported to defendant Physician Assistant Meghan Hughes.

58.     In recognition of the fact that Mr. Viney presented signs of a serious illness, Hughes ordered that Mr. Viney be placed in the medical housing unit and that his vital signs be assessed during everyone one of three daily nursing shifts.

59.     Despite her knowledge that Mr. Viney had several concerning symptoms, Hughes did not conduct any examination of Mr. Viney or assess him in any way.

60.     Nor did Hughes take any action to ensure that laboratory studies—which still had not been drawn—would be conducted.

61.     On the same date, a nurse weighed Mr. Viney and recorded a weight of 191 pounds, a decrease of nine pounds in just five days.

62.     At 2:25 pm on August 5, 2018, defendant Harvey saw Mr. Viney again for the first time since she observed his concerning symptoms on July 30, 2018.

63.     Before assessing Mr. Viney, Harvey knew that Mr. Viney already had signs of a serious illness given the rapid and significant fluctuations in his weight and the unexplained swelling in his legs.

64.     Harvey also knew that the laboratory studies she and Cohen had ordered for completion on July 31, 2018 had still not been conducted even after the passage of five days.

65.     When Harvey assessed Mr. Viney, she immediately saw that his symptoms had grown substantially worse.  As she reported, the swelling in his extremities, which Mr. Viney stated had started a week earlier, was present in both his legs and his hands.  According to Mr. Viney, he had never experienced such swelling before.  Mr. Viney also reported that he remained constipated.

66.     Harvey also reported that Mr. Viney had jaundiced sclera—that is, the white outer layer of his eyes had turned yellow.  This new finding was strongly suggestive of liver failure, a sign of critical and potentially fatal illness.  Such a finding required immediate assessment and consultation with medical specialists.

67.     Harvey, however, neither conducted such assessment nor sought consultation from any specialist.

68.     Instead, Harvey merely noted that a nurse in the medical housing unit would be directed to conduct the laboratory testing which had been ordered six days earlier.

69.     Harvey noted that medical staff would continue to monitor Mr. Viney while he was housed in the medical housing unit.

70.     As of the afternoon of August 5, 2018, defendant Dr. Carrillo, as the medical director at MCCF charged with supervising all medical staff, was aware of Mr. Viney's medical situation, including the following:

    a.   He had a history of untreated hypothyroidism;

    b.   He had experienced significant, rapid, and unexplained weight gain followed by significant, rapid, and unexplained weight loss;

    c.   For at least a week, he had unexplained swelling in his extremities, and that swelling was increasing as time progressed;

    d.   He had jaundiced eyes, showing evidence of liver failure; and

    e.   Laboratory testing which had been ordered six days earlier had not been conducted.

71.     Carrillo was, therefore, aware that Mr. Viney was suffering from a serious and potentially fatal illness and that necessary assessments to determine the cause of that illness had not been carried out.

72.     Defendants Cohen, Harvey, and Hughes, were, given their previous encounters with Mr. Viney likewise aware of these facts.

73.     Despite Harvey's notation from the afternoon of August 5, 2018 that there would be continuous monitoring of Mr. Viney, no such monitoring took place.

74.     At no time during the evening of August 5, 2018, did any PrimeCare medical staff examine or assess Mr. Viney.

75.     At no time on August 6, 2018, did any PrimeCare medical staff examine or assess Mr. Viney.

76.     At no time during the morning or afternoon of August 7, 2018, did any PrimeCare medical staff examine or assess Mr. Viney.

77.     Defendants Carrillo, Cohen, Harvey, and Hughes were aware that no examination or assessment of Mr. Viney had been conducted from the afternoon of August 5, 2018 through the afternoon of August 7, 2018.

78.     At 6:06 pm on August 7, 2018, more than 51 hours after defendant Harvey had noted the deeply concerning symptoms described above, defendant Carrillo examined Mr. Viney.

79.     Carrillo found that Mr. Viney's condition had deteriorated even further as he presented with signs of multiple organ failure.

80.     According to Carrillo's assessment, Mr. Viney presented with Anasarca, that is severe swelling throughout the entire body, with the swelling having started approximately ten days earlier.

81.     She also noted that he had marked jugular vein distension, a sign of heart failure.

82.     Carrillo reported that Mr. Viney had difficulty walking due to the swelling in his legs and that he was confined to a wheelchair.

83.     He also had decreased urination, malaise, shortness of breath, and he was not eating.

84.     Mr. Viney's vital signs were abnormal with an extremely high respiratory rate. Carrillo noted that Mr. Viney was taking rapid and shallow breaths.

85.     Carrillo determined that Mr. Viney could be suffering from cardiac dysfunction, acute kidney failure, or myxedema (a severe form of hypothyroidism) and ordered that he be sent to the emergency room.

86.     When Mr. Viney arrived at a local emergency room he was in complete organ failure and critical condition.  He was diagnosed with severe heart failure, inflammation of the liver, acute kidney injury, hypothyroidism, metabolic acidosis, and interstitial lung disease.

87.     He was quickly transferred to a different facility where he could be placed in an intensive care unit.

88.     Two days after Mr. Viney was hospitalized, a laboratory report was produced based on blood drawn from Mr. Viney on the morning of August 7, 2018.  The blood had not been received in the laboratory until the afternoon of August 8, 2018.  The report showed grossly abnormal liver function tests, abnormal kidney function tests, and significant hypothyroidism.

89.     Because these results were produced after Mr. Viney's hospitalization, they had no impact on his care.

90.     Based on the grossly abnormal levels found in the results, had the laboratory studies been performed when they were ordered a week earlier, they would have provided confirming evidence of abnormal liver and kidney function and hypothyroidism.

91.     Mr. Viney remained in an intensive care unit for nearly 100 days as physicians continually struggled to resolve the consequences of his complete organ failure.

92.     Throughout that time, he experienced extraordinary pain and suffering to the point that by mid November 2018 he had spontaneous bleeding and his skin began to tear off.

93.     On November 16, 2018, based on the advice of Mr. Viney's treating physicians, his family elected to withdraw care.

94.     Mr. Viney died on November 17, 2018.

**C.  Defendants' Violation of Mr. Viney's Constitutional
Rights and Relevant Standards of Care**

95.     Defendants Carrillo, Cohen, Harvey, and Hughes were aware of Mr. Viney's concerning symptoms and that he had serious medical needs.

96.     Notwithstanding their knowledge of Mr. Viney's serious medical needs, defendants Carrillo, Cohen, Harvey, and Hughes, with deliberate indifference and in violation of relevant standards of care, failed to take actions to address Ms. Viney's needs by, among other things, failing to secure laboratory assessments critical to understanding Mr. Viney's unexplained and worrying symptoms, failing to seek consultation and hospitalization as Mr. Viney's symptoms worsened to the point that he appeared to be in liver failure, and failing to continuously monitor him for more than two days despite specific notations confirming the need for such continuous monitoring.

97.     Mr. Viney's death was the direct and proximate result of the defendants' failures as outlined above.

98.     At all times relevant to this Complaint, as evidenced by the failures outlined above, defendants PrimeCare and Montgomery County, with deliberate indifference, failed to develop and implement policies, practices, and procedures to ensure that prisoners in the position of Mr. Viney would receive adequate treatment for serious medical needs.

99.     At all times relevant to this Complaint, as evidenced by the failures outlined above, defendants PrimeCare and Montgomery County, with deliberate indifference, failed to ensure proper training, supervision, and discipline for PrimeCare employees so as to ensure that prisoners in the position of Mr. Viney would receive adequate treatment for serious medical needs.

100.    In particular, as evidenced by numerous previous federal civil rights lawsuits alleging the same types of failures as present in this case—the failure to ensure needed medical assessments, the failure to seek consultation or hospitalization, and the failure to continuously monitor prisoners presenting with acute medical needs—defendants PrimeCare and Montgomery County have, with deliberate indifference, failed to take remedial action to prevent the provision of inadequate care to prisoners at MCCF.

101.    Further, as evidenced by numerous previous federal civil rights lawsuits alleging the same types of failures as present in this case, defendants PrimeCare and Montgomery County have, with deliberate indifference, failed to remedy a contractual arrangement which provides a financial disincentive for defendant PrimeCare to send prisoners with serious medical needs for treatment at a hospital.

102.    At all times relevant to this Complaint, the conduct of all defendants was in willful, reckless, and callous disregard of Mr. Viney's rights under federal and state law.

103.    As a direct and proximate result of the conduct of all defendants, Mr. Viney experienced enormous physical and emotional pain and suffering.

104.    As a direct and proximate result of the conduct of all defendants, Mr. Viney was caused to lose his life and the enjoyment of his life, including complete loss of earnings and earnings capacity.

## V.  WRONGFUL DEATH AND SURVIVAL ACTIONS

105.    Plaintiff, as Administrator of the Estate of Eric Viney, bring this action on behalf of Mr. Viney's heirs under the Pennsylvania Wrongful Death Act, 42 Pa. C.S. § 8301.

106.    Plaintiff brings this action on behalf of the following heirs under the Wrongful Death Act:

a.   Plaintiff, Mr. Viney's spouse;

b.   S.V., Mr. Viney's minor daughter, who resides with plaintiff; and

c.   J.V., Mr. Viney's minor son, who resides with plaintiff.

107.    Mr. Viney did not bring an action against defendants for damages for the injuries causing his death during his lifetime.

108.    Mr. Viney's heirs have, by reason of Mr. Viney's death, suffered pecuniary loss, and have or will incur expenses for the costs of Mr. Viney's funeral, the costs of Mr. Viney's headstone, and the costs of administering Mr. Viney's estate.

109.    Mr. Viney's heirs have, by reason of Mr. Viney's death, suffered further pecuniary loss including expected contributions and financial support from Mr. Viney for food, clothing, shelter, medical care, education, entertainment, recreation, and gifts.

110.    Plaintiff also brings this action on behalf of the Estate of Eric Viney under the
Pennsylvania Survival Statute, 42 Pa. C.S. § 8302, under which all claims Mr. Viney would have
been able to bring had he survived may be brought by Mr. Viney's estate.

111.    Mr. Viney's estate has, by reason of Mr. Viney's death, suffered pecuniary loss,
and has or will incur expenses for the costs of Mr. Viney's funeral, the costs of Mr. Viney's
headstone, and the costs of administering Mr. Viney's estate.

112.    As a direct and proximate result of the conduct of all defendants, Mr. Viney
experienced extraordinary physical and emotional pain and suffering before his death, and, as a
result of his death, suffered the loss of the enjoyment of his life and complete loss of earnings
and earnings capacity.

113.    Plaintiff, via this survival action, seeks damages for these harms caused to Mr.
Viney.

## VI.  CLAIMS FOR RELIEF

### COUNT 1
**Plaintiff v. Defendants Carrillo, Cohen, Hughes, and Harvey**
**Federal Constitutional Claims**

114.    Defendants Carrillo, Cohen, Hughes, and Harvey were deliberately indifferent to
Mr. Viney's serious medical needs and thereby violated Mr. Viney's right to be free from cruel
and unusual punishment under the Eighth Amendment to the United States Constitution and/or
his right to due process of law under the Fourteenth Amendment to the United States
Constitution.

## COUNT 2
### Plaintiff v. Defendants Montgomery County and PrimeCare
### Federal Constitutional Claims

115.    The violations of Mr. Viney's constitutional rights under the Eighth and /or

Fourteenth Amendments to the United States Constitution, plaintiff's damages, and the conduct

of the individual defendants were directly and proximately caused by the actions and/or inactions

of defendants Montgomery County and PrimeCare, which have, with deliberate indifference,

failed to establish policies, practices, and procedures and/or have failed to properly train,

supervise and discipline their employees regarding the provision of adequate medical care to

prisoners with serious medical needs.

## COUNT 3
### Plaintiff v. Defendants Carrillo, Cohen, Hughes, Harvey, and PrimeCare
### State Law Negligence Claims

116.    Defendants Carrillo, Cohen, Hughes, and Harvey had a duty to comply with

generally accepted medical standards of care in their treatment of Mr. Viney.

117.    Defendants Carrillo, Cohen, Hughes, and Harvey violated their duty of care.

118.    The defendants' violation of their duty of care to Mr. Viney was a direct and

proximate cause and a substantial factor in bringing about Mr. Viney's damages as outlined

above, and, as a result, defendants are liable to plaintiff.

119.    Because the individual defendants were acting as agents, servants, and/or

employees of defendant PrimeCare, and because the individual defendants were acting within the

scope and course of their employment, and under the direct control and supervision of defendant

PrimeCare, defendant PrimeCare is liable to plaintiff on the basis of *respondeat superior*

liability.

## VII.  REQUESTED RELIEF

**Wherefore**, plaintiff respectfully requests:

A.      Compensatory damages as to all defendants;

B.      Punitive damages as to defendants Carrillo, Cohen, Hughes, Harvey, and

PrimeCare;

C.      Reasonable attorneys' fees and costs;

D.      Such other and further relief as may appear just and appropriate.

Plaintiff hereby demands a jury trial.

_____
Jonathan H. Feinberg
I.D. No. 88227
KAIRYS, RUDOVSKY, MESSING, FEINBERG
  & LIN LLP
The Cast Iron Building
718 Arch Street, Suite 501 South
Philadelphia, PA  19106
215-925-4400
215-925-5365 (fax)
jfeinberg@krlawphila.com

*Counsel for Plaintiff*

JS 44 (Rev 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM)*

## I. (a) PLAINTIFFS

Nakila v Viney, as Administrator of the Estate of Eric Viney

**(b)** County of Residence of First Listed Plaintiff   Montgomery
*(EXCEPT IN U S PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Jonathan H Feinberg, Kairys, Rudovsky, Messing, Feinberg & Lin, 718 Arch Street, Suite 501 South, Philadelphia, PA 19106, 215-925-4400

## DEFENDANTS

Montgomery County, PrimeCare Medical, Inc ; Margaret Carrillo, MD, Jonathan Cohen, MD, Meghan Hughes, PA, Katie Harvey, CRNP

County of Residence of First Listed Defendant
*(IN U S PLAINTIFF CASES ONLY)*

NOTE   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

Attorneys *(If Known)*

20   367

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

◻ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

◻ 2   U.S. Government
Defendant

◻ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)                     and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ◻ 1 | ◻ 1 | Incorporated or Principal Place of Business In This State | ◻ 4 | ◻ 4 |
| Citizen of Another State | ◻ 2 | ◻ 2 | Incorporated and Principal Place of Business In Another State | ◻ 5 | ◻ 5 |
| Citizen or Subject of a Foreign Country | ◻ 3 | ◻ 3 | Foreign Nation | ◻ 6 | ◻ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for  Nature of Suit Code Descriptions

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ◻ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ◻ 625 Drug Related Seizure of Property 21 USC 881 | ◻ 422 Appeal 28 USC 158 | ◻ 375 False Claims Act |
| ◻ 120 Marine | ◻ 310 Airplane | ◻ 365 Personal Injury - Product Liability | ◻ 690 Other | ◻ 423 Withdrawal 28 USC 157 | ◻ 376 Qui Tam (31 USC 3729(a)) |
| ◻ 130 Miller Act | ◻ 315 Airplane Product Liability | ◻ 367 Health Care/ | | | ◻ 400 State Reapportionment |
| ◻ 140 Negotiable Instrument | ◻ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ◻ 410 Antitrust |
| ◻ 150 Recovery of Overpayment & Enforcement of Judgment | ◻ 330 Federal Employers' Liability | Product Liability | | ◻ 820 Copyrights | ◻ 430 Banks and Banking |
| ◻ 151 Medicare Act | ◻ 340 Marine | ◻ 368 Asbestos Personal Injury Product Liability | | ◻ 830 Patent | ◻ 450 Commerce |
| ◻ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ◻ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ◻ 835 Patent - Abbreviated New Drug Application | ◻ 460 Deportation |
| | | | | ◻ 840 Trademark | ◻ 470 Racketeer Influenced and Corrupt Organizations |
| ◻ 153 Recovery of Overpayment of Veteran's Benefits | ◻ 350 Motor Vehicle | ◻ 370 Other Fraud | **LABOR** | **SOCIAL SECURITY** | ◻ 480 Consumer Credit |
| ◻ 160 Stockholders' Suits | ◻ 355 Motor Vehicle Product Liability | ◻ 371 Truth in Lending | ◻ 710 Fair Labor Standards Act | ◻ 861 HIA (1395ff) | ◻ 485 Telephone Consumer Protection Act |
| ◻ 190 Other Contract | ◻ 360 Other Personal Injury | ◻ 380 Other Personal Property Damage | ◻ 720 Labor/Management Relations | ◻ 862 Black Lung (923) | ◻ 490 Cable/Sat TV |
| ◻ 195 Contract Product Liability | ◻ 362 Personal Injury - Medical Malpractice | ◻ 385 Property Damage Product Liability | ◻ 740 Railway Labor Act | ◻ 863 DIWC/DIWW (405(g)) | ◻ 850 Securities/Commodities/ Exchange |
| ◻ 196 Franchise | | | ◻ 751 Family and Medical Leave Act | ◻ 864 SSID Title XVI | ◻ 890 Other Statutory Actions |
| | | | | ◻ 865 RSI (405(g)) | ◻ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ◻ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ◻ 893 Environmental Matters |
| ◻ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | ◻ 791 Employee Retirement Income Security Act | ◻ 870 Taxes (U S Plaintiff or Defendant) | ◻ 895 Freedom of Information Act |
| ◻ 220 Foreclosure | ◻ 441 Voting | ◻ 463 Alien Detainee | | ◻ 871 IRS—Third Party 26 USC 7609 | ◻ 896 Arbitration |
| ◻ 230 Rent Lease & Ejectment | ◻ 442 Employment | ◻ 510 Motions to Vacate Sentence | | | ◻ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ◻ 240 Torts to Land | ◻ 443 Housing/ Accommodations | ◻ 530 General | | | |
| ◻ 245 Tort Product Liability | ◻ 445 Amer w/Disabilities - Employment | ◻ 535 Death Penalty | **IMMIGRATION** | | ◻ 950 Constitutionality of State Statutes |
| ◻ 290 All Other Real Property | ◻ 446 Amer w/Disabilities - Other | **Other:** | ◻ 462 Naturalization Application | | |
| | ◻ 448 Education | ◻ 540 Mandamus & Other | ◻ 465 Other Immigration Actions | | |
| | | ◻ 550 Civil Rights | | | |
| | | ◻ 555 Prison Condition | | | |
| | | ◻ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original
Proceeding

◻ 2 Removed from
State Court

◻ 3 Remanded from
Appellate Court

◻ 4 Reinstated or
Reopened

◻ 5 Transferred from
Another District
*(specify)*

◻ 6 Multidistrict
Litigation -
Transfer

◻ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U S Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*
42 USC 1983

Brief description of cause
Deliberate indifference to serious medical needs

## VII. REQUESTED IN COMPLAINT:

◻ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F R Cv P

DEMAND $

CHECK YES only if demanded in complaint
JURY DEMAND:   ☒ Yes   ◻ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE _____   DOCKET NUMBER _____

DATE
01/22/2020

SIGNATURE OF ATTORNEY OF RECORD

JAN 22 2020

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG JUDGE _____

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**20   367**

DESIGNATION FORM
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ c/o Plaintiff's Counsel _____

Address of Defendant: _____ 60 Eagleville Road, Eagleville, PA 19403/2940 Locust Ln, H'burg, PA 17109 _____

Place of Accident, Incident or Transaction: _____ Montgomery County Correctional Facility, Eagleville, PA _____

---

**RELATED CASE, IF ANY:**

Case Number _____ Judge _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions

| | | | | |
|---|---|---|---|---|
| 1 | Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 2 | Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court? | Yes ☐ | No ☑ |
| 3 | Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court? | Yes ☐ | No ☑ |
| 4 | Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual? | Yes ☐ | No ☑ |

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above

DATE: 01/22/2020 _____ *Must sign here* _____ 88227

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.  *Federal Question Cases:***

- ☐ 1  Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2  FELA
- ☐ 3  Jones Act-Personal Injury
- ☐ 4  Antitrust
- ☐ 5  Patent
- ☐ 6  Labor-Management Relations
- ☐ 7  Civil Rights
- ☐ 8  Habeas Corpus
- ☐ 9  Securities Act(s) Cases
- ☐ 10  Social Security Review Cases
- ☑ 11  All other Federal Question Cases
  *(Please specify)* _____

**B.  *Diversity Jurisdiction Cases:***

- ☐ 1  Insurance Contract and Other Contracts
- ☐ 2  Airplane Personal Injury
- ☐ 3  Assault, Defamation
- ☐ 4  Marine Personal Injury
- ☐ 5  Motor Vehicle Personal Injury
- ☐ 6  Other Personal Injury *(Please specify)* _____
- ☐ 7  Products Liability
- ☐ 8  Products Liability – Asbestos
- ☐ 9  All other Diversity Cases
  *(Please specify)* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Jonathan H. Feinberg _____, counsel of record *or* pro se plaintiff, do hereby certify

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs

☐ Relief other than monetary damages is sought

DATE: 01/22/2020 _____ *Sign here if applicable* _____ 88227

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38

JAN 22 2020

Civ. 609 (5/2018)



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

## CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| Nakila V Viney | : | CIVIL ACTION |
| v. | : | |
| Montgomery County et al | : | NO. **20 367** |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

### SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ( )

(f) Standard Management – Cases that do not fall into any one of the other tracks. (✓)

| | | |
|---|---|---|
| 1/22/20 | _[signature]_ | Plaintiff Nakila V. Viney |
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-925-4400 | 215-925-5365 | jfeinberg@krlawphila com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

JAN 22 2020